**171-15**

ORIGINAL

TRIAL No. D-1-DC-12-301480

APPEL. CAUSE NO. 03-13-00746-CR

## IN THE
## Court of Criminal Appeal of TEXAS

THOMAS ATKINSON

VS.

THE STATE OF TEXAS

RECEIVED IN
COURT OF CRIMINAL APPEALS

MAY 14 2015

Abel Acosta, Clerk

FROM the Third District Court of Appeals,
CAUSE NO. _____, And the
403rd Judicial District Court for Travis
County. CAUSE NO. D1DC-12-301480.

Petitions for Discretionary Review

Thomas Atkinson

FILED IN
COURT OF CRIMINAL APPEALS

MAY 14 2015

Abel Acosta, Clerk

# Parties And Counsel

The following constitutes a list of all part to the trial court's final judgment and the names and addresses of all trial and appellate counsel:

Petitioner

Thomas Atkinson
Pro Se Litigant

Petitioner Trial
Counsel

Keith Lauerman
Attorney At Law
SBOT No. 00786044
107 N. Lampasas St.
Round Rock, Tx. 78664
Phone: (512) 676-3200

Respondent Trial
Counsel

Joe Frederick
District Attorney's Office
SBOT No. 24057071
509 W. 11th st.
Austin, Tx. 78701
Phone: (512) 854-9400

i

# Index of Authorities

CASE          Page

Daubert Vs. Merrell Dow Pharmaceuticals,
113 S.ct. 2786 (1993)_____3

Deck Vs. Missouri, 136 S.W.3d 481 (2005)__ 2

In Re Leslie Gene Goodman, 210 S.W.3d 805 (2006)2

Lester Ray Lewis, 587 S.W.2d 697 (1979)__ 2

Strickland Vs. Washington, 466 U.S. 668 (1984)_3

# Table of Contents

Party And Counsels .................................................. i

Index of Authorities .............................................. ii

Statement Regarding Oral Argument ........... iii

Statement of the Case ........................................ iii

State of Procedural History ............................. iv

Grounds of Review ........................................... iv

Argument .............................................................. 1-3

Prayer for Relief ................................................ 3

Appendix .............................................................. 4

## Statement Regarding Oral Argument

There are no oral arguments needed. [See Appendix Attached]

## Statement of Case

The Appellant was indicted and convicted of murder pursuant to Tx. Penal Code §19.02 (b)(1). Appellant plead not guilty before a jury penel and the jury found the Appellant guilty sentencing him to (75) yrs. in the Tx. Dept. of Criminal Justice.

The Appellant's filed a timely appeal in the Court of Appeal.

The Appellant's counsel filed an Ander brief stating the the appeal was frivolous and that the Appellant's case had no errors.

The Court of Appeals affirmed the conviction on Jan 22, 2015. Stating that the jury assessed punishment at (75) yrs. in prison and that the trial court sentenced Appellant accordingly.

The Court of Appeals further states:

Appellants Court Appionted Counsel's brief meets the requirement of Ander vs. U.S., by presenting a professional evaluation of the record and demonstrating that there are no arguable grounds to be advanced, therefore, the Court of Appeals has affirmed the Trial court judgment of Conviction.

## Statement of Procedural History

On January 22, 2015, the Court of Appeals affirmed the conviction. [Atkinson Vs State, (Not Published) No. 03-13-00746 CR (TX. App Austin, delivered January 22, 2015).
There was no other motions or opinions filed.

## Grounds for Review

1) **Prosecutorial Misconduct** - in that the prosecutor with held evident, used speculation and characterised the appellant to get the conviction.

2) **Ineffective Assistance of Counsel** - the trial counsel failed to object to any of prosecutor's charactering thoughts of the appellants and trial counsel had appellant placed in restraints while on trial.

3) **Challenge of the Evident** - in that it was an expect witness that testified, to appellant not being at that location where the murder happen.

## Argument

The first argument is based on the prose-

cutor's compulsory production of the only eye witness. Whereas the prosecutor's withhold her whereabout. When in fact he (the prosecutor) used taxes payer money to pay for her room and board, but did not tell the defense attorney where she was. [See Federal Rules of Evidence - Rule 701]

Based on this Rule the credibility of the eye witness is in question.

Also the prosecutor's speculation and characterizm of the appellant to prove his conduct was only speculation and should not be used. [See Federal Rules of Evidence - Rule 404 (a) and (b)] and Case Citizions of [In Re Leslie Gene Goodman, 210 S.W.3d 805 (Tx. App. Texarkana 2006); Ex parte Lester Ray Lewis, 587 S.W.2d 697 (1979)]

Appendix -
Appendix -
Appendix -
Appendix -

## Second Argument

Is that of Ineffective Assistance of Counsel. In this case the appellant's counsel fail below the standard in that:

A) the counsel did not make any objections;
B) Did no investation of his own;
C) Refuse to talk with the appellant; and
D) Had appellant placed in shackle with leg irons, handcuffs and belly chain.
E) Defense counsel lied of DNA sent to Cellmark to be tested (C: pg 10) copy of Cellmark's letter stating it never received physical evidence. By Mr. Lauerman, as he stated on record.

[SEE DECK Vs. Missouri, 136 S.W.3d 481 (2005);
Also Strickland Vs Washington, 466 U.S. 668 (1984)]

## Third Argument

In this Argument the is the use of perjured testimony, over the testimony of expert witness. [SEE Federal Rules Evidences Rule 703]; [Rule 401]; And Daubert Vs. Merrell Dow Pharmaceuticals Inc., 113 S.Ct 2786 (1993)]

SEE Appendix –
Appendix –
Appendix –

## Prayer for Relief

Wherefore, Premise Considered, I respect-fully Pray that this Court Address And correct this wrongful Conviction, by Granting this Petition for Discretionary Review.

Executed ON May 11, 2015.

Respectfully Submitted

Thomas Atkinson
TDCJ-ID #1886762
3201 FM 929
Gatesville, TX. 76597

## Certificate OF Service

I, Thomas Atkinson, hereby certify that on this the 11th day of MAY, 2012, AN original and a copy of the foregoing Petition for Discretionary Review, is being mailed to The Court of Criminal of Appeal for Texas; P.O. Box 12308; Austin, TX. 78711.

Thomas Atkinson
Thomas Atkinson
Pro SE

4

CAUSE NO. 03-13-00746-CR

THOMAS ATKINSON,
          Appellant.

                                    §          IN THE 3RD COURT
                                    §
                                    §
V.                                  §          OF APPEALS AT
                                    §
THE STATE OF TEXAS,                 §
          Appellee.                 §          AUSTIN, TEXAS

## MOTION TO PROCEED, IN PRO-SE STATUS, AND REQUEST FOR A REASONABLE AMOUNT OF TIME TO FILE HIS APPELLANT'S BRIEF

**COMES NOW,** Thomas Atkinson, #1886762, Appellant in the above-styled and numbered cause, and files this motion to proceed as pro se status and to ensure the Appellant the opportunity to file his Appellant's brief on his own behalf and shows this Court good cause to **grant** this motion as follows:

1.) Appellant's attorney filed a motion to withdraw as counsel with annexed brief in support on March 18, 2014.

2.) Appellant's counsel feels that the Appellant's appeal has no merit and will not stand.

3.) Appellant believes that he can prove that there are three potential grounds that are non-frivolous: which are A) Legal insufficiency claim; B) A Rule 403 of the Texas Rules of Evidence-Prejudicial effect of some of the evidence outweighed the probative value of it; and C) Under rule 901-there was not proper identification of some evidences at trial.

4.) The Appellant believes that these grounds are substantial errors to be brought out at this time.

5.) A denial of the Appellant to proceed as pro se status and denying an opportunity to file his Appellant's brief would

1

be a denial of his Due Process Rights and Due Course of Law.

## PRAYER

Appellant prays that this Court will grant this motion and give the Appellant the opportunity to proceed as pro se status and file his brief on his own behalf with a reasonable amount of time to prepare his brief.

## INMATE DECLARATION

I, Thomas Atkinson, TDCJ-ID #1886762, being incarcerated in the Texas Department of Criminal Justice-Institutional Division, at the Coffield Unit in Tennessee Colony, Anderson County, Texas, declares that the foregoing is true and correct under the penalty of perjury.

Executed this the 28th day of March, 2014.

Respectfully Submitted,

Thomas Atkinson, pro se
TDCJ-ID #1886762
H. H. Coffield Unit
2661 FM 2054
Tennessee Colony, Texas 75884

Thomas Atkinson
TDCJ-ID #1886762
H. H. Coffield Unit
2661 FM 2054
Tennessee Colony, TX 75884

March 27, 2014

Amalia Rodriguez-Mendoza
District Clerk
Travis County Courthouse
P.O. Box 1748
Austin, TX 78767

RE: Trial Court Case Number: D-1-DC-12-301480
    Court of Appeals Number: 03-13-00746-CR

Dear Clerk,

On Tuesday, March 18, 2014, Appellant's counsel filed an Anders brief on behalf of Appellant. At this time, Appellant is requesting a copy of the record pursuant to TRAP 34.5(g) and 34.6(h). Pursuant to this statute in the Texas Rules of Appellate Procedure, the trial clerk is required to furnish Appellant with a copy of the trial record. Appellant asks that you would please furnish me with a copy of the Clerk's record and the Reporter's record as soon as possible.

Thank you in advance for your time and service in this matter.

Sincerely,

Thomas Atkinson, pro se

cc: File
    Jeffrey D. Kyle, Clerk for the Thir District Court of Appeals

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00746-CR

### Thomas Atkinson, Appellant

### v.

### The State of Texas, Appellee

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 403RD JUDICIAL DISTRICT
## NO. D-1-DC-12-301480, HONORABLE BRENDA KENNEDY, JUDGE PRESIDING

## MEMORANDUM OPINION

Appellant Thomas Atkinson was tried before a jury and found guilty of the offense of murder. *See* Tex. Penal Code § 19.02(b)(1). The jury assessed punishment at 75 years in prison, and the court sentenced appellant accordingly. *See id.* § 12.32 (punishment range for first-degree felony is minimum of 5 years and maximum of 99 years).

Appellant's court-appointed attorney has filed a motion to withdraw supported by a brief concluding that the appeal is frivolous and without merit. Counsel's brief meets the requirements of *Anders v. California* by presenting a professional evaluation of the record and demonstrating that there are no arguable grounds to be advanced. *See Anders v. California*, 386 U.S. 738, 744-45 (1967); *Garner v. State*, 300 S.W.3d 763, 766 (Tex. Crim. App. 2009); *see also Penson v. Ohio*, 488 U.S. 75, 80-82 (1988). Appellant's counsel has represented to the Court that he provided copies of the motion and brief to appellant; advised appellant of his right to examine the appellate record, file a pro se brief, and pursue discretionary review following dismissal of this appeal as

frivolous; and provided appellant with the mailing address of this Court and the trial court so that he could inform the courts if he desired to review the record and submit a brief. *See Kelly v. State*, 436 S.W.3d 313, 319-21 (Tex. Crim. App. 2014); *see also Anders*, 386 U.S. at 744; *Garner*, 300 S.W.3d at 766. Appellant requested and received the appellate record and filed three briefs.

We have independently reviewed the record and have found nothing that might arguably support the appeal. *See Anders*, 386 U.S. at 744; *Garner*, 300 S.W.3d at 766; *Bledsoe v. State*, 178 S.W.3d 824, 826-27 (Tex. Crim. App. 2005). We agree with counsel that the appeal is frivolous and without merit. We grant counsel's motion to withdraw and affirm the judgment of conviction.[1]

David Puryear, Justice

Before Justices Puryear, Goodwin, and Field

Affirmed

Filed: January 22, 2015

Do Not Publish

---

[1] No substitute counsel will be appointed. Should appellant wish to seek further review of his case by the Texas Court of Criminal Appeals, he must either retain an attorney to file a petition for discretionary review or file a pro se petition for discretionary review. *See generally* Tex. R. App. P. 68-79 (governing proceedings in Court of Criminal Appeals). Any petition for discretionary review must be filed within thirty days from the date of either this opinion or the date that this Court overrules the last timely motion for rehearing filed. *See id.* R. 68.2. The petition must be filed with the clerk of the Court of Criminal Appeals. *Id.* R. 68.3(a). If the petition is mistakenly filed with this Court, it will be forwarded to the Court of Criminal Appeals. *Id.* R. 68.3(b). Any petition for discretionary review should comply with the rules of appellate procedure. *See id.* R. 68.4. Once this Court receives notice that a petition has been filed, the filings in this case will be forwarded to the Court of Criminal Appeals. *See id.* R. 68.7.



**Cellmark**
**FORENSICS**
LabCorp Specialty Testing Group

13988 Diplomat Dr. Suite 100
Dallas, TX 75234
Tel. 800-752-2774
Fax. 214-271-8322

May 29, 2013

Keith Lauerman
Attorney at Law
1524 S. IH-35 #175
Austin, Texas 78704

Agency Case Number D1DC-12-301480
Austin Police Department Laboratory #: L1207393
Orchid Cellmark case Number: CR13-0013

Dear Mr. Lauerman,

I have reviewed the discovery materials released by the Austin Police Department Forensic Science Services Division, including all processes and procedures performed in this case, the accreditations of the laboratory, the curriculum vitae and proficiency test results of all laboratory personnel involved in this case, and all laboratory standard operating procedures. I have formed the following opinions concerning the results and conclusions rendered by their laboratory regarding the testing performed in this case.

It appears from the documentation received that the testing was performed in an appropriate manner according to generally accepted standards and practices in the forensic community. While there are a couple of minor anomalies noted from the review of the materials, which I will outline below, I have determined that the overall conclusions reached seem justified based on the data generated.

According to the initial DNA report dated 7/17/2012, there were five items that DNA analysis was requested on. However, DNA analysis was only performed on two of these items. The tested items were lab item #34, a partially burned cigarette, and lab item #16, the blood standard from Alejandro Hernandez Jr. Lab items #18 (swabs from the front passenger's side dashboard handle of the victim's vehicle), #26 (swabs from the exterior front passenger door handle and surrounding textured area of maroon Chevrolet Silverado) and #27 (swabs from interior front passenger door handle, grip, arm rest, and textured surfaces of seat belt parts in maroon Chevrolet Silverado) were not tested. I cannot find any information in the case report or the case file as to why these items were not tested for DNA. Testing of these items may produce additional results relevant to this case.

Lab item #34, the partially burned cigarette, produced a mixed DNA profile. While Thomas Trent Atkinson is the source of the major component of this profile, there are minor peaks present in this profile as well. While the minor component is too minimal to make any good comparisons, these minor peaks are not consistent with the DNA profile of the victim. Could another person have been present in the vehicle that possibly touched this cigarette butt? It is possible that the DNA profile of another person could be developed if other samples in this case were tested.



**Cellmark**
**FORENSICS**
.....................
LabCorp Specialty Testing Group

13988 Diplomat Dr. Suite 100
Dallas, TX 75234
Tel. 800-752-2774
Fax. 214-271-8322

As an accredited laboratory we keep detailed records of all reagents that are used during our testing. We document the lot number and expiration date of each reagent as well as the quality control steps taken for each reagent to ensure accurate and reliable results are obtained. In this case the lot numbers for reagents are listed for each process, but the expiration dates are not given for some of the reagents. This information may be located in paperwork stored in the laboratory, but I do not have this information to review. Have all reagents used in this case been properly documented and quality checked where necessary? Were all reagents used prior to their expiration dates?

During the processing of DNA from the evidence and reference samples in this case there are several instances where the sample is removed from a tube and transferred to a new tube or to a plate. These transfers create several chances for cross-contamination or sample switching to occur. A good laboratory practice is to have a second analyst do a check prior to transferring samples to ensure that the sample is being transferred into the correctly labeled tube or into the correct position on a plate. In this case, there is no indication that any transfer checks were performed during any steps of the process.

All of the testing in this case was performed properly and followed all laboratory standard operating procedures and accreditation guidelines. The Austin Police Department Forensic Science Services Division was able to obtain a mixed DNA profile from the partially burned cigarette and Thomas Trent Atkinson is the source of the major component of this profile. Obviously, DNA testing does *not* tell the jury how or when the DNA originated on this item. DNA testing only indicates that this profile was obtained from this piece of evidence. Sufficient amount of this sample remains for retesting if it is deemed necessary.

Should you have any questions, please call me at (214) 271-8338 or email me at kbyrd@orchid.com.

Sincerely,

Kelli Byrd, M.S.
DNA Analyst IV



**Cellmark**
**FORENSICS**
·····················
LabCorp Specialty Testing Group

13988 Diplomat Dr. Suite 100
Dallas, TX 75234
Tel. 800-752-2774
Fax. 214-271-8322

January 19, 2015

Ms. Sharon Atkinson
203 Windridge Dr.
Niederwald, TX 78640

Agency Case Number D1DC-12-301480
Austin Police Department Laboratory #: L1207393
Orchid Cellmark case Number: CR13-0013

Dear Ms. Atkinson,

This letter is in response to a subpoena we received asking for clarification about the work Cellmark Forensics performed in this case. No physical testing of evidence was performed at Cellmark Forensics in relation to this case. We did not test a cigarette butt for DNA. The only work I performed on this case was a review of the discovery materials released by the Austin Police Department Forensic Science Services Division, including all processes and procedures performed in this case by their laboratory, the accreditations of the laboratory, the curriculum vitae and proficiency test results of all laboratory personnel involved in this case from the Austin Police Department, and all Austin Police Department laboratory standard operating procedures.

Should you have any questions, please call me at (214) 271-8338 or email me at kbyrd@orchid.com.

Sincerely,

Kelli Byrd, M.S.
Supervisor, Forensic Casework

Dear, Your Honor                                    6-28-13

I am writing in hope's to please have chance
to talk you. I have already sent in a Motion
to dismiss appointed Counsel, and it was filed -
Jun. 5, 13. - He started representing me on 1·3-13,
I have been locked up since Aug. 3, 12. My first
Attorney relized that he had represented the D.A's
star witness some time back and so after
6 month's on the Case he with drew, he said
it would be a conflict of intress, and that he
wouldn't be able to cross examun her in trial.

That's when I was appointed, keith Lauerman
and the date was 1·3-13, so from Jan-to-May 17, 13
he had not done, Nothing but send off a
cigarett for D·N·A test. And I just received
the letter back along with resolt's Jun 3, 13.

Around, March 28, or 29, he said he would be
coming up her in which he did showe, and I
talk to him about some interesting angle's -
I pointed out to him. He then asked me did
I want him to set it for trial? I said yes!
He then said O.K. I'll set it for April 11, 13.
when April 11, 13 rolled around I never went to
court nore did he set me for trial or put me on
the dockit. I tryed calling his office for 5
week's strait finaly going on almost 6 week's
he answers, ➔

Filed In The District Court
of Travis County, Texas
JUL - 2 2013
Amalia Rodriguez-Mendoza, Clerk

Your Honor, I also gave him name's and number's to people who he could call on my behalf, who would testatie, concerning the D.A's. Star witness people who she was close to. He never called any of them. So needless to say I was varry up set. I said are you serious!! What have you done? Well were looking for the D.A's star witness. I said why? Well we wont to get her statement. I then told him you already have her statement, dont you, its like the 3rd-time I told him, she gave a writen statement to the grand jury. He then say's and I qute, "As for any alleged Grand jury testimony, I will obtain that, if any exist".

Then lastly in his letter from May 17,13, he tell's me, "If any future communication includes any more frivolous accusations that I'm "Snoozing" or somehow not meeting your expections, I will limit the phone call's I accept from you. This goes for your mother as well.

He has not been up front with me concerning the statement she gave to grand jury, he has switched word's around, I know because my first Attorney let me read it but not give me a copy. I realy feel that these attorney's treat you like crap because you don't have 25,000 30,000 dollars to pay them.

I would realy like to talk to you in person and also show you what the Forensic Lab in Dallas said about their findings. And would realy like to have a M.H.M.R Attorney I am disabled and do receive S.S.D.I. and Was on M-H-M-R Case load. I do have a court date July 2,13 but dont know if this attorney will call me up stairs if he knows Im tryen to get appointed new counsel.

As I said, I have sent in a motion to dismiss countsel, it was filed, Jun 5, 13. And I realy dont trust him representing me any longer can you please help me.

Sincerely,

Thomas T. Atkinson

Thomas T. Atkinson

CAUSE NO. _DiDC-12-301980_

THE STATE OF TEXAS

V.

_Thomas T. Atkinson._

IN THE DISTRICT COURT

_331_ JUDICIAL DISTRICT

TRAVIS COUNTY, TEXAS

---

## MOTION TO DISMISS APPOINTED COUNSEL

---

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now _Thomas T. Atkinson_, Defendant in the above

styled and numbered cause and moves the Court to dismiss _Keith Lauerman_

as appointed attorney of record for Defendant, and in support of said motion

would show the Court the following:

### I.

Defendant stands charged with the felony offense of _Murder_,
which is a violation of Section _19.02_ of the Texas Penal/Health and Safety
Code.

### II.

That _Keith Lauerman_ was appointed as attorney of record on the
_3_ day of _Jaunory_, _13_.

### III.

That appointed counsel has failed to file the appropriate and requested
pre-trial motions necessary to the adequate and reasonable defense to the charge
pending against Defendant herein.

Motion to Dismiss Appointed Counsel

1

Filed in The District Court
of Travis County, Texas

JUN 05 2013

At_____M.

Amalia Rodriguez Mendoza, Clerk

## IV.

Defendant has lost faith in counsel and no longer trusts counsel's advice.

## V.

That as a result of the attitude of said counsel, there now exists an irreparable, antagonistic relationship between Defendant and appointed counsel, and if Defendant is obliged to stand trial herein with the representation of said counsel, he will be denied a fair trial, and moreover, will have ineffective assistance of counsel and will be denied his basic constitutional rights. Defendant also will be denied due process and equal protection under the law pursuant to the Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States, and Article 1, Sections 10, 19 and 29 of the Texas Constitution and Article 1.05 of the Texas Code of Criminal Procedure.

WHEREFORE PREMISES CONSIDERED, Defendant respectfully moves the Court to dismiss _Keith Lauerman_, as his attorney of record herein, and further requests the Court appoint new counsel to represent Defendant in this cause.

Respectfully submitted,

_Thomas T. Atkinson_

_____
Attorney for Defendant

Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on this the _28_ day of _May_, _13_, a true and correct copy of the above and foregoing Motion to Dismiss Appointed Counsel was transmitted to the office of the Travis County District Attorney, Criminal Justice Center, P.O. Box 1748, Austin, Texas, 78767.

_Thomas T. Atkinson_
Defendant

## ORDER

On this the _19_ day of _September 2013_, came on to be heard Defendant's Motion to Dismiss Appointed Counsel and said motion is hereby

( ) GRANTED      (✓) DENIED

Signed this the ___ day of _September, 2013_

_____
Judge Presiding

REPORTER'S RECORD

VOLUME 2 of 9 VOLUMES

TRIAL COURT CAUSE NO. D-1-DC-12-301480

APPELLATE CAUSE NO. 03-13-00746-CR

| | | |
|---|---|---|
| STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| VS. | ) | TRAVIS COUNTY, TEXAS |
| THOMAS ATKINSON | ) | 403RD JUDICIAL DISTRICT |

* * * * * * * * * * * * * * * * * *

STATEMENT OF FACTS

* * * * * * * * * * * * * * * * * *

*This is my Arraignment this is also where I told Judge I wanted a knew Attorney.*

On the 10th day of July, 2013, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Brenda Kennedy, Judge presiding, held in Austin, Travis County, Texas:

Proceedings reported by Machine Shorthand.

APPEARANCES

JOE FREDERICK                    KEITH LAUERMAN
District Attorney's Office       Attorney at Law
SBOT NO. 24057071                SBOT NO. 00786044
509 West 11th Street             107 N. Lampasas St.
Austin, Texas 78701              Round Rock, Texas 78664
Phone:  (512) 854-9400           Phone:  (512) 671-3200
ATTORNEY FOR THE STATE           ATTORNEY FOR THE DEFENDANT

*(Open court, defendant present)*

THE COURT: This is Cause No. 12-301480, the State of Texas versus Thomas Atkinson.

Mr. Atkinson, you are here for the offense of murder. Your attorney has been discussing the case with the State, and I think the consensus is that it is time that we move this case to the trial docket.

Is that correct?

MR. FREDERICK: That's correct. I extended an offer of 35 TDCJ to the Defense, and I'm assuming they are going to reject that and we'll just go to trial.

THE COURT: And, Mr. Atkinson, your attorney has discussed that offer with you?

THE DEFENDANT: Yeah.

Ms. Kennedy, ma'am, I don't want him as my attorney.

THE COURT: Well, you are free -- if you are able to hire one, you can hire whomever you want, but this is the second attorney that we've appointed for you.

THE DEFENDANT: Well, the first one withdrew, ma'am, on his own because he knew that he couldn't cross-examine the witness, the star witness,

concerning the DA's, you know, witness.

THE DEFENDANT: This man has been procrastinating. Not only procrastinating, he has been lying to me.

THE COURT: About what?

THE DEFENDANT: About when he was going to come set me for trial, even also paperwork that he -- that he has sent to me concerning Ms. Coffey who was also -- who is his star witness.

THE COURT: You're going to have to be more specific because I'm not understanding what you are talking about.

THE DEFENDANT: I have the paperwork.

THE COURT: No, but I don't understand what the problem is.

THE DEFENDANT: Okay. Ma'am, what happened was -- he was --

THE DEPUTY: Put your hands behind your back.

THE DEFENDANT: This is how I talk, though.

He was -- he was telling me and giving me the statement that Ms. Coffey had gave to the grand jury, okay.

THE COURT: Have we ordered grand jury testimony?

THE COURT: No, I understand what DNA is. The State has control of all that evidence so I'm asking the State.

MR. FREDERICK: There was DNA on a cigarette butt that was found inside the victim's car. That came back from APD fairly quickly for DNA, within six months.

THE COURT: Within six months?

MR. FREDERICK: Something like that.

THE DEFENDANT: No, they got it nine days.

MR. FREDERICK: You don't do DNA in nine days.

THE DEFENDANT: I got the paperwork.

MR. FREDERICK: He then -- the Defense hired an ex parte lab, I guess, essentially to retest.

MR. LAUERMAN: Orchid Cellmark was sent the samples --

THE COURT: Right, I remember that.

MR. LAUERMAN: -- first of this year, back in February or March.

MR. FREDERICK: We couldn't do anything until those results came back.

MR. LAUERMAN: We got the results in May and I immediately sent Mr. Atkinson a copy of the

report along with all the information at the time. So I have sent him numerous letters in the last couple of months. He's been up-to-date on things. We had to wait a period of time for that DNA to come back.

THE COURT: Well, as it stands right now, the case is on the pretrial without docket and we are just now getting ready to put it on the trial docket. So I am -- you are free to hire whomever you want, but I'm not going to appoint another lawyer to represent you because those grounds don't reach the level that are necessary for me to do so, so I am not going to do that.

THE DEFENDANT: Ma'am, at this point --

THE COURT: What I am going to do, though, is arraign you on this indictment.

THE DEFENDANT: At this point, though, ma'am, I have -- I feel that I have improper -- the relation between him and I has become antagonistic. I feel that if I continue to go on with this man, I will be not given a fair trial and it will be against my constitutional rights for this man to still be my attorney after we have come to --

THE COURT: I have already said what I'm going to do and what I'm not going to do, and that's what's going to happen.

So what I am going to do right now, though, is arraign you on the indictment.

This is Cause No. 12-301480, the State of Texas versus Thomas Atkinson for the offense of murder. This murder is a first-degree felony, carrying from five to 99 years or life and a $10,000 fine as possible punishment.

Have you received a copy of this indictment more than ten days ago?

THE DEFENDANT: Uh-huh.

THE COURT: Yes or no?

THE DEFENDANT: Yeah.

THE COURT: Yes or no?

THE DEFENDANT: I just said yeah.

THE COURT: You said, yeah. I said, yes or no? The answer is either yes or no. Have you?

THE DEFENDANT: Yes.

THE COURT: So you do understand what you are charged with?

THE DEFENDANT: I understand.

THE COURT: And, State, would you put your pretrial offer on the record?

MR. FREDERICK: 35 years TDCJ, credit for any backtime.

THE COURT: You have had the opportunity

to discuss that offer with your attorney?

THE DEFENDANT: No, he wrote me a letter.

THE COURT: Do you want to discuss the 35-year offer with him or not?

THE DEFENDANT: I don't want to discuss no years.

THE COURT: Are you rejecting that offer?

THE DEFENDANT: I'm rejecting it.

THE COURT: We will note for the record that the offer has been rejected on today.

Do you want that the State read the allegations contained in the indictment to you, or do you waive the reading of this indictment?

THE DEFENDANT: I already done read it. I don't need them reading it to me again.

THE COURT: So you waive the reading of the indictment?

THE DEFENDANT: Uh-huh.

THE COURT: To the allegation of first-degree felony murder, how do you plead?

THE DEFENDANT: Not guilty.

THE COURT: You do understand that you do have a right to have a trial by jury?

THE DEFENDANT: Yeah.

THE COURT: And that is the type of trial that you want to have?

THE DEFENDANT: Uh-huh.

THE COURT: And the jury docket call date is what?

COURT COORDINATOR: September 19th.

THE COURT: September 19th for trial the following week.

Okay. That's when we are set, so whatever motions -- I don't know if you already have a standing discovery in addition to the motions you previously filed --

MR. LAUERMAN: Not yet.

THE COURT: -- but we have a standing discovery order that we can sign right now. They are over there. As soon as you get it filled out, I will sign it.

MR. LAUERMAN: Okay.

THE COURT: And that will be a pref setting for that week.

MR. FREDERICK: Thank you, Your Honor.

MR. LAUERMAN: Thank you, Judge.

THE COURT: Okay. Thank you.

(Proceedings adjourned)

REPORTER'S CERTIFICATE

STATE OF TEXAS )
COUNTY OF TRAVIS )

I, Roxanne Davenport, Official Court Reporter in and for the 403rd District Court, Travis County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of proceedings requested by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $_____ and was paid by Travis County.

WITNESS MY HAND this the 21st day of January, 2014.

/s/ Roxanne Davenport
Roxanne Davenport, TX CSR 5359
Expiration Date: 12/31/2015
403rd District Court
P.O. Box 1748
Austin, Texas 78767
(512) 854-9620
roxanne.davenport@co.travis.tx.us

Now, that phone call, according to this chart that you provided, has the defendant's phone number and it's at 4:04; is that correct?

A. Yes, sir.

Q. And that is just south of West Braker, is that correct, that tower?

A. Yes, sir.

Q. And the tower or the antennas, I mean, are pointing out toward 35?

A. That's correct.

Q. Do you have any estimate of distance between that tower and the murder scene?

A. I think that was, if I'm remembering my radius map, it was over two miles.

Q. Okay, two miles. Two miles pointing out toward 35?

A. Well, at least -- more than two miles from the murder location.

MR. LAUERMAN: Pass the witness.

REDIRECT EXAMINATION

BY MR. FREDERICK:

Q. So if someone were to say -- Mr. Atkinson were to say that he had not spoken or had communication with Leanna Coffey sometime before this date, would these records contradict that?

MR. LAUERMAN: I'm going to object. That's speculation, Your Honor.

MR. FREDERICK: I'm asking her a question with regards to the defendant's statement. This is concrete data that they did have communication.

THE COURT: You need to repeat that question. I thought -- are you speaking about this date specifically?

MR. FREDERICK: Yes, ma'am.

THE COURT: Repeat the question again.

Q. (BY MR. FREDERICK) If Mr. Atkinson said that he had not had contact with Leanna Coffey sometime prior to July 9, 2012, would these contradict that?

MR. LAUERMAN: I would object to that question, Judge. I think she is testifying as to a number associated with a person. She doesn't know who was using that phone.

THE COURT: Okay. I guess you need to reference the number in your question, Counsel.

MR. FREDERICK: Sure.

Q. (BY MR. FREDERICK) What number does Mr. Atkinson have under his name at this time -- at that time?

A. It's the (512) 902-1491.

Q. Okay. And what number did Ms. Coffey have

under her name at that time?

A. (512) 945-7360.

Q. So if a person were to say that his number or his phone, Mr. Atkinson, for example, who had that phone under his name, claimed that his phone never contacted or he had never had contact with Leanna Coffey's phone during this time period or sometime prior to July 9, 2012, would this data dispel that?

A. This data would dispel that for the time in question on the 9th from 12:00 a.m. to 6:00 a.m.

Q. And would this data then conclude at some point between 3:00 in the morning and 6:00 in the morning on the day of the murder at Lola street Leanna Coffey's phone contacted Mr. Atkinson's phone?

A. That is correct.

Q. And Mr. Atkinson's phone contacted Ms. Coffey's phone?

A. That is correct.

Q. Mr. Atkinson's phone was within a mile of the murder location?

A. Yes.

Q. And then exited the murder location sometime after the body was found at 6:00 in the morning?

A. That's correct.

MR. FREDERICK: Pass the witness.

MR. LAUERMAN: No further questions, Your Honor.

THE COURT: Thank you. You may step down.

MR. FREDERICK: State calls Elizabeth Morris.

THE COURT: Raise your right hand, please.

*(Witness sworn)*

ELIZABETH MORRIS,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FREDERICK:

Q. Could you please introduce yourself to the members of the jury.

A. My name is Elizabeth Morris, M-o-r-r-i-s.

Q. How and where are you employed?

A. I'm a senior DNA analyst and the local CODIS administrator for the Austin Police Department DNA lab.

Q. What is a CODIS administrator?

A. I am responsible for the daily upkeep of our CODIS. CODIS is the Combined DNA Index System, so it's a way to look at DNA profiles and search them. I am in charge of the entry and the maintenance of that.

Q. Now I want to take you back to July 18, 2012.

Your lab number being L-1207393. Were you also a CODIS administrator on that date?

A. Yes.

Q. And this is the lab number that's associated with APD Offense No. 2012-1910327?

A. Yes.

Q. And that's the murder investigation for which we are here today?

A. That is correct.

Q. Did you receive confirmation that a specimen that was collected from that crime scene had a hit, a CODIS hit?

A. I did receive that. It was on a different date, but, yes, I did receive that.

Q. What date did you receive that?

A. Can I check my records?

Q. Sure.

A. Received the notification on 7/17, so the day before the report was issued.

Q. And then what did you do?

A. Basically what happens is once the profile is entered into CODIS, we then get a report back if it does match something. In this particular one, this is what we could call a rush case or something that was a higher priority, so this actually resulted in a phone



Vol. 6

call over to the state DNA laboratory, the index CODIS lab, for them to manually enter this and manually search so it went a little bit differently to go a little bit faster.

So then they notified me that it did match something. So at that point we then said, please follow up on that. And they followed up on that and issued the report, which I put in the case file.

Q. What was actually, in particular, the hit was from was a filter paper from a partially burned cigarette?

A. Yes, that's correct.

Q. And did you then initiate a report to the detective in this case?

A. Yes. We call it an information report, where I just told them that a hit occurred and that they should check the paperwork from the Department of Public Safety.

Q. And then after that, a confirmation, I guess, submission is done; is that correct?

A. Yes, we do request that they submit a reference sample if an individual has been identified that we can compare with the evidence.

Q. And you did not do that?

A. No, I did not.

MR. FREDERICK: Pass the witness.

MR. LAUERMAN: No objection -- I mean, no questions.

THE COURT: All right. Thank you. You may step down.

MR. FREDERICK: State calls Diana Morales.

THE COURT: Raise your right hand, please.

*(Witness sworn)*

MR. FREDERICK: May I inquire?

THE COURT: Yes.

DIANA MORALES,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FREDERICK:

Q. Good afternoon. Could you please introduce yourself to the members of the jury.

A. My name is Diana Morales.

Q. How and where are you employed?

A. My last name is spelled M-o-r-a-l-e-s.

I'm employed at the Austin Police Department crime lab.

Q. What do you do there?

A. I'm a DNA forensic scientist.

Q.    What are your responsibilities and duties?

A.    My duties include to examine physical evidence such as knives or shirts that can be found at a crime scene; to examine those and try to identify biological material which can be blood or semen or saliva; to take all of those type of samples and perform DNA testing and to develop a DNA profile.

At the same time, my duties include to develop a DNA profile for a possible subject involved in a case, for example, a particular individual like a victim or someone else; and to take the crime scene DNA profiles and compare those to the known reference samples from the individuals of interest, which would be a known saliva from that person; and to make comparisons and make a report stating the conclusions found.

Q.    What is your educational background?

A.    I have a master's degree in forensic science from the University of Central Oklahoma, and I have a bachelor's degree from Texas Tech University in biology.

Q.    What are your qualifications?

A.    I am a senior DNA analyst at the Austin Police Department.

Q.    Have you received any specialized training?

A. Like this (pointing), like that is the face of it right there.

Q. And what about the other towers?

A. So I do that for the other towers also. So this tower up here, the azimuth is 240 and so it is facing this direction here (pointing).

Q. Now, I'm going to move this a little bit so we can get the last cell phone tower on here. Is that better?

A. Yes, sir.

Q. Now can you explain to the members of the jury when the earliest call is made?

A. 3:19.

Q. And where is that cell phone facing and where did that call hit that cell phone tower?

A. So it hit the tower on the antenna that is facing this direction (pointing) at 120 degrees, and so that would seem to indicate that the phone is in this area here (pointing).

Q. Within the area of 202 West Lola?

A. Very -- yes.

Q. Now --

A. Well, I cannot say it was right there (pointing), but it was in this area somewhere.

Q. In the vicinity?

A.    Yes.

Q.    And Rundberg is up further?

A.    Rundberg is right here (pointing).

Q.    And Rundberg has its own tower?

A.    Yes, sir.

Q.    So the first call is what time?  3:19?

A.    3:19.

Q.    Then where is the second call after that?

A.    So the second call is at 3:25:22.

Q.    Off of Rundberg?

A.    Yes, sir.

Q.    Where is the third call?

A.    The third call is 3:32:03, this one down here near I-35 south of Anderson Lane.

Q.    And where is the fourth call?

A.    The fourth call is back here at this tower at 3:42:48.

Q.    So it's going from the first tower which is near Wooten?

A.    Uh-huh.

Q.    Up to Rundberg?

A.    Yes.

Q.    Back down 35?

A.    Yes.

Q.    To the I-35 tower?

A.   Yes.

Q.   Then straight across and back to the Wooten tower, correct?

A.   Yes.

Q.   Now I'm showing you what's been marked as State's Exhibit 146.   What is this?

A.   So this is the one call that we know -- that we have for 4:00 a.m. to basically 5:00 a.m.

Q.   Where is that cell phone tower?

A.   So this one is up near West Braker Lane west of North Lamar.

Q.   So from the last call which was at the Wooten tower we have now gone further north?

A.   That's correct.

Q.   I'm showing you State's Exhibit 144.   What is that?

A.   Which this is the same -- this is that same call, the 4:04:23 call, but it is actually showing now the antenna orientation that handled that call.

Q.   And where is it -- where did that call hit?

A.   So it hit the antenna that is oriented at 120 degrees and, you know, so the phone was likely over here in this area (pointing).

Q.   I'm showing you State's Exhibit 142.   What time frame was this?

A.   That's 5:00 a.m. to 6:00 a.m.

Q.   And what call?  What tower is being hit?

A.   Lift it up a little bit, please.

Q.   Sure.  I'm sorry about that.

A.   So one phone call at 5:43:25 and it hits the cell phone tower that is south of Anderson Lane near I-35.

Q.   State's Exhibit 143 is what?

A.   It's that same call with the orientation of the antenna being 130 degrees, so over here in this area (pointing).

Q.   State's Exhibit 144?

A.   And that's just showing them all together from 3:00 a.m. to 6:00 a.m.

Q.   Now, if someone were to come here and testify that at approximately 3:00, 3:30 they were at Lola Drive and Mr. Atkinson was there with a phone or Mr. Atkinson's phone was there, what tower would you be hitting?

A.   Well, there is overlap in the coverage of the antennas.  You don't want to have any dead zones, right?  So I would think that the phone would either be hitting this tower here or this tower here (pointing).

Q.   And where is it hitting?

A.   Well, at 3:19 it is hitting this tower

(pointing).

Q. At 3:32?

A. At 3:32 it's hitting this tower.

Q. And at 3:42?

A. And at 3:42 it's hitting that tower.

Q. Focusing between 3:00 and 6:00 in the morning, on your chart are there any calls or communications between Mr. Atkinson's phone and Leanna Coffey?

A. Yes, sir, there are.

Q. Where? What time?

A. From 3:19 to 4:04 a.m. there are five calls.

Q. Let's go break it down. At 3:19 who is calling whom?

A. So at 3:19 Mr. Atkinson is calling Leanna.

Q. Where is he on this phone call?

A. Right here (pointing).

Q. The next call?

A. The next one is 3:25:22, and this is Leanna calling Mr. Atkinson's phone.

Q. And now he is up by 275?

A. Right here. Yes, this one (pointing).

Q. The next call?

A. The next one is at 3:32:03, and this is Leanna calling Trent, Mr. Atkinson.

Q. And where is he?

please.

Q. (B

perimeters

A. I

Q. Ma

A. Ye

Q. Ma

State's 146

recognize t

A. Ye

Q. Wh

A. So

towers that

also shows

one-and-a-h

gives you —

antennas ar

Q. No

to the jury

are, distar

A. I

Q. Sc

A. Bu

Q. Cc

A. (Pointing).

Q. Next call?

A. The next one is at 3:42

calling Mr. Atkinson, and that's

(pointing).

Q. And the last call?

A. And the last one is the

is Leanna calling Trent and it i

(pointing).

Q. From these records at t

3:42 call is Mr. Atkinson's phon

Lola Drive?

A. After the 3:42 call?

Q. Yes.

A. Not between 3:42 and 6:(

Q. You can have a seat.

A. (Resumes stand).

Q. Now, you can't tell how

from a cell phone tower, correct?

A. That is correct.

Q. You can just give the lc

are near or respective to a cell

A. Yes, a general area.

Q. That's as close as you c

A. Yes, sir.

accurate copy, first of all?

A. Yes, sir.

MR. FREDERICK: State moves 146 into evidence.

MR. LAUERMAN: No objection.

THE COURT: It's admitted.

Q. (BY MR. FREDERICK) Would you mind stepping down.

A. (Witness complies).

Q. Where is the murder location?

A. It's right here (pointing).

Q. Now, what do these lines mean?

A. So this circle -- well, you see -- you see the tower locations that we have looked at before and then these are one-mile radius circle, so it just shows that these two towers here are less than a mile away from the murder location.

This circle here is a mile and a half radius, and so you see that that one is about a mile and a half away from the murder location. And then this outside one is a two-mile radius, so you see that this tower up here is a little more, you know, more than two miles away.

Q. Now I'm going to switch a little bit from 146 to 144. Based upon that chart that you just described

in 144, the tower that is hit by the murder location at 3:19 is how far from the murder location?

A. Less than a mile.

Q. The tower that is hit from the murder location at 3:42 is how far?

A. Less than a mile. Those are the same towers -- I mean, it is the same tower.

Q. You can grab a seat.

A. (Resumes stand).

MR. FREDERICK: Pass the witness.

MR. LAUERMAN: Your Honor, may I approach the witness?

THE COURT: You may.

CROSS-EXAMINATION

BY MR. LAUERMAN:

Q. I'm going to attempt a little technology myself, ma'am, and we're going to see if you can see that map okay on there.

A. Yes, sir.

Q. All right. Now, what this -- this is Exhibit 146 and it shows the cell phone towers that you just described and the radiuses of distance that we just talked about?

A. Yes, sir.

Q. Now, if you look at the tower right here

(pointing), okay, and that you gave the different antennas and the area that it covers, correct, on the previous maps?

A. Yes, sir.

Q. That would include all this area just north of the murder scene, which would be on Georgian Drive, isn't that correct, according to this map?

A. Well, this map is not showing the antenna.

Q. Okay. Well, the antenna on the previous -- let me get to -- let's use this, then, in conjunction.

That shows the antenna, right?

A. Yes, sir. The orientation of the antenna, yes.

Q. So it shows the orientation of the antenna shooting out, and I don't know how many degrees that would be, but it covers everything in between, correct?

A. Yes, sir.

Q. So any houses, residences, apartment complexes within that radius would also be reflected in the data that you looked at, right?

A. Well, the phone could be.

Q. Could be anywhere in that --

A. Yes, sir.

Q. -- in that slot?

A. Yes.

Q.   So the technology that you are looking at does not pinpoint it to any location, correct?

A.   That is correct.

Q.   And the -- what you have labeled up there is merely the tower and not the location of the phone, correct?

A.   That's correct.  And in this map it is also the orientation of the antenna, yes, sir.

Q.   Of the antenna?

A.   Yes.

Q.   So if you extend that antenna out each way and then you combine that with the radiuses that you've been provided and entered into evidence, that can cover a lot of ground, correct?

A.   Well, there are other --

Q.   Let me just stop you there.

MR. FREDERICK:  Your Honor, may the witness explain her answer?

MR. LAUERMAN:  It is a yes or no question.

MR. FREDERICK:  Your Honor, she is entitled to answer the question and then explain it.

THE COURT:  You need to repeat the question first.

Q.   (BY MR. LAUERMAN) Isn't it true that that

covers a large amount of area?

A. Well, I guess -- I guess I would ask you to define large.

Q. Several square miles.

A. I don't know. I don't know that it would be that large.

Q. All right. Well, what's been entered into evidence with these radiuses, you have a mile, mile and a half, two miles and then you have those antennas that shoot out at various angles. So if you combine this shooting out at different angles, it would cover everything within those radiuses, correct?

MR. FREDERICK: Objection; vague.

THE COURT: If she doesn't understand the question, she can state so.

A. May I see that?

Q. (BY MR. LAUERMAN) Sure.

A. So I believe -- you know, I'm having to put two pieces of information together. And so it looks like from the angle of that antenna near Wooten that it would capture a lot of the area indicated by this, at least the one-mile radius circle except, you know, obviously where the angle doesn't cover.

Q. Sure. I understand.

That would include the area of Georgian

Drive? Let me see if it is clear on this map.

So if Georgian Drive is right here, see where it says Georgian Drive?

A. Yes, sir.

Q. And all the surrounding areas, if there were apartments along Georgian, that would be included as best we can put together that data and this radius, right?

A. That's correct.

Q. All right. Now, I noticed on the one linear chart that you put together for Leanna Coffey you only had calls from her to him. Were there any calls from her to other numbers?

A. Well, that chart -- that chart is using the data from Mr. Atkinson's phone. It is not using the data from her phone.

Q. So you don't know if she made other calls or not?

A. No, sir, I don't.

MR. LAUERMAN: Approach the witness again, Your Honor?

THE COURT: You may.

Q. (BY MR. LAUERMAN) This one is already up on the screen. I wanted to bring your attention to this phone call right here at the top (pointing).

passenger's seat of a truck?

A. No, I am not.

Q. Especially an older model truck?

A. That is correct.

Q. But you do have -- or Leanna Coffey cannot be excluded as a contributor to the DNA on that truck, that passenger seat?

A. That is correct.

Q. Now you move on to the front passenger door handle.

A. Item 26.1?

Q. Item 26.1. So there is a swab from the outside of the door handle of the truck, the handle to open up?

A. Would you like the results?

Q. Yes, please.

A. The partial DNA profile from the swab of this item is consistent with a mixture of at least three individuals.

So now I have stated that it is a partial because now I don't have all the information available that I could have gotten from another sample, or in all the DNA markers that are available, I wasn't able to retrieve information from all of them. It was an --

Q.   Why not?

A.   I'm sorry?

Q.   Why not?

A.   It is just due to the nature of the sample. I'm not surprised to see that on the exterior front passenger door, it's on the outside of the vehicle. Again, it could be due to rain or just the fact that there's a mixture of at least three individuals. Sometimes the information can be competitive between individuals and so we start to lose information in a DNA profile.

Q.   Now, let me ask you a question.  If you were to go to my car and the car that I opened the door handle almost every day, would you expect to see my DNA on that door handle?

A.   I would expect to see it on the inside of the door handle.

Q.   Sure.  Well, let's try the outside if I wanted to open it every day to get into the car.

A.   Right.

Q.   Unless I Dukes-of-Hazzard-it and go through the window.

So I open it every day.  You would expect to see my DNA there?

A.   Yes, depending on the integrity or how we --

how you've maintained the vehicle, if it hasn't rained, if you haven't washed it, if the weather has been perfect and no one else has touched it. There's so many factors to consider.

Q. Now, my wife sometimes borrows my car and she also has to enter it through the door. You would probably expect to see her DNA?

A. Yes.

Q. Now, if my neighbor were to borrow my door one time and enter obviously through the driver's side door, would you expect to see his DNA on that car?

A. Not likely.

Q. Why not?

A. Because there's so much more DNA that could be deposited from someone who makes contact with that item on a daily basis as opposed to one person touching it one time. The more contact you make with an object, the more likely you are to leave your DNA; the less contact, the less likely you are.

Q. And if you were to find my neighbor's DNA or he could not be excluded, would you expect to see the numbers lower than my numbers?

A. Yes.

Q. Is that because of the repeated contact?

A. I would expect to see, in general, the DNA

profile numbers be a little lower because now we are talking about multiple people giving to that sample so we could have a mixture.

Q. What were the results of that front passenger door handle?

A. The partial DNA profile from this item is consistent with a mixture of at least three individuals. Thomas Trent Atkinson cannot be excluded as a contributor to this profile at certain markers. Given the statistics of those markers, the probability of selecting an unrelated person at random who could be a contributor to this profile is approximately one in 90 for Caucasians, one in 48 for African-Americans, and one in 36 for Hispanics.

Q. So so far in your reports for DNA analysis what we have here is a cigarette butt where the defendant cannot be excluded as the majority contributor?

A. That's correct.

Q. We have a front passenger seat of the crime scene where Leanna Coffey cannot be excluded as being a contributor, her DNA cannot be excluded from there?

A. That's correct.

Q. And we have an outside -- we have an outside front passenger door handle where Mr. Atkinson's DNA --

he cannot be excluded as being a contributor to the DNA found on that car?

A. This is Item 26.1?

Q. Yes, ma'am.

A. That is correct.

Q. What else did you test?

A. The DNA profile from the swab from the interior front passenger door handle, grip, armrest, and textured areas of the seat belt parts of the maroon Chevrolet Silverado is consistent with a mixture of at least three individuals. Thomas Trent Atkinson, Leanna Coffey, and Alejandro Hernandez, Jr., can be excluded as contributors of this profile.

MR. FREDERICK: Pass the witness.

CROSS-EXAMINATION

BY MR. LAUERMAN:

Q. Ms. Morales, let me -- we've covered a little ground here and science was not my strong suit, so bear with me.

When you test DNA, it's like from our hands or whatever, there are skin cells that are transferred, right?

A. That is correct.

Q. And different people shed cells at different rates; isn't that correct?

A.    That is correct.

Q.    So you could have someone that could handle something quite a bit and really not shed that many cells versus someone who doesn't handle it very often shed a lot of cells?

A.    That is correct.

Q.    So in that situation, one person's DNA may show up a little more than another's, right?

A.    Yes.

Q.    When you examine DNA, you don't know the source of that; in other words, if it's saliva, if it's skin cells or any other way to transfer, you can't tell that when you analyze it?

A.    That is correct.

Q.    So if a person were to give an item, I think Mr. Frederick talked about a Styrofoam cup with water, if I had it and gave it to somebody else, you may find both contributors on there, correct?

A.    That is correct.

Q.    But because we shed cells at different rates it may be hard to tell who the major contributor really is?

A.    That is correct.

Q.    So if I have a cigarette, for example, and I have it in my ear and I carry my cigarette and I want

to give it to somebody, there's a possibility my DNA may be on that cigarette, right?

A.  That is correct.

Q.  But you can't tell that by your testing, right?

A.  I can't tell how it got there.

Q.  Correct.

A.  That is correct.

Q.  In other words, you can't tell by your test, hey, this cigarette came from somebody's ear?

A.  No, I cannot.

Q.  Or any other source from the body, correct?

A.  That is correct.

Q.  When you test this stuff for DNA, you cannot tell when the DNA was put there, correct?

A.  That is also correct.

Q.  In other words, your science does not allow you to time stamp to say this DNA was put on here at such and such a time?

A.  That is correct.

Q.  We're not there yet, right?

A.  That is correct.

Q.  So we never know when the DNA gets on it and we never know how it got on it; isn't that correct?

A.  That is correct.

Q. You had mentioned earlier in your testimony when he asked you about which ones you select to test -- because at the beginning, you didn't test everything, right?

A. That is correct.

Q. And I believe your testimony was that you would get with others involved in the case, you don't test every item, but you test those that would support the events that took place?

A. Support or negate the alleged events.

Q. Okay. So you would know the events of what happened before you test?

A. Yes, I would.

Q. A detective would say, we're looking for A, B, or C?

A. That is correct.

Q. And then you would select the items that would support A, B, or C to test, correct?

A. That could support it, yes.

Q. So if a detective has a theory on the case earlier on, that would factor into which ones to test?

A. It would.

Q. So it's just not a neutral testing of items, it is something that is based on what is given to you by the detectives?

A.   Based on the case scenario of each case, yes.

Q.   The case scenario presented by the detectives?

A.   Yes.

Q.   So in this case, we have a person who has been shot in a truck and you're testing items that were in the truck, correct?

A.   Yes, I did.

Q.   And you are not drawing any conclusions, are you, from your DNA testing as to how that man got shot?

A.   No, I am not.

Q.   In fact, your DNA testing on the cigarette really is unrelated to the source of this man's death?

A.   That is correct, other than the fact that I believe from the information that it could be related to the incident.

Q.   Supplied by the detective?

A.   Yes.

Q.   Now, your testing procedure, I imagine, is pretty detailed, correct?

A.   Yes, it is.

Q.   And you -- in this particular case, did you have a lot of transfers of the samples?

A.   During the DNA processing there are four basic steps and within those steps, yes, the sample itself, is it moved around a lot?  Yes.

Q. Okay. And they are transferred sometimes from tube to tube?

A. Yes.

Q. And what would cause your results to vary or be inaccurate would be if it got transferred into the wrong tube, correct?

A. That is correct.

MR. LAUERMAN: Judge, just give me a minute just to scan something.

Q. (BY MR. LAUERMAN) Would you explain what regents {sic} are during the testing?

A. Reagents?

Q. Reagents, I'm sorry.

A. Reagents are liquids of chemicals that are added to samples in order to enhance the capability of developing a DNA profile.

Q. And it's important that these reagents are -- I mean, they have an expiration date, correct?

A. That is correct.

Q. If they're not -- if they expire, that could influence the outcome of your test?

A. It could.

Q. Did you note on the report when you did these tests that -- the expiration date of the reagents?

A. They would be not in the report, but in other

parts of the -- my notes basically throughout the steps.

Q. Okay. Do your notes indicate if the reagents, the expiration dates are noted?

A. Yes, they are.

Q. Do you use a barcode system when you transfer from tube to tube?

A. No, we do not.

Q. Do you know why some labs would use that barcode system?

A. It's just to verify where in the process that sample is if somebody wanted to know exactly where sample A is in the DNA testing process.

Q. Well, it's to safeguard against cross-contamination, correct?

A. Not necessarily. Not a barcode.

Q. When you say can't be excluded, you're not meaning that that is conclusively that person's DNA, are you?

A. It depends on which -- it depends on the report itself and what exactly am I saying, the information in the paragraphs. So I have referred to not be excluded several times throughout my report. In one particular portion of the report I can say specifically that I -- the source can be identified as

a particular individual; in other parts, I cannot.

Q. You never say in your reports, though, conclusively that this is someone?

A. I do not say conclusively. No, I do not.

MR. LAUERMAN: Pass the witness.

REDIRECT EXAMINATION

BY MR. FREDERICK:

Q. You never say conclusively, right?

A. That is correct.

Q. Now, I've never been in your car, correct?

A. That is correct.

Q. Would you expect to see my DNA on your door handle?

A. I would not.

Q. Would you expect to see a cigarette of mine in your car?

A. No, I would not.

Q. You aren't the only one to have tested the DNA on that cigarette butt, are you? These items were sent by the Defense to Cellmark?

MR. LAUERMAN: I'm going object to that, Judge. He's testifying.

Q. (BY MR. FREDERICK) Do you know if they were sent to Cellmark lab?

A. I don't recall that information. I remember

sending information from my results to an external laboratory for review, but I do not recall getting results saying that they tested it nor that I sent it out.

Q. So you were requested, was it by court order?

A. Yes.

Q. Are you aware that the Defense asked the Court to sign that order?

A. Yes.

Q. And then you took your results, your report, your findings?

A. Yes.

Q. Your reagents, expiration dates and all that stuff?

A. Yes.

Q. And you sent it by FedEx to Cellmark?

A. Yes, I did.

Q. And you have never heard back from them?

A. I did not.

Q. Let's go back to that cigarette butt that both Cellmark and you tested. For blacks, it's one in how many quadrillion?

A. One in 17.82 quadrillion for blacks.

MR. FREDERICK: No further questions.

MR. LAUERMAN: No questions, Judge.

THE COURT: Okay. Thank you. You may step down.

MR. FREDERICK: Your Honor, may we approach?

THE COURT: Yes.

*(At the Bench, on the record)*

MR. FREDERICK: I have Greg Karim here. I don't know if it is too late.

THE COURT: Who is that?

MR. FREDERICK: The firearms person.

THE COURT: That is a lengthy witness or very short?

MR. FREDERICK: 30 minutes.

THE COURT: No, I'll let them go home and come back in the morning.

MR. FREDERICK: Yes, Judge.

*(Open court, defendant and jury present)*

THE COURT: Ladies and gentlemen of the jury, I am going to recess you for the evening. Please be back again at 9:00 a.m. tomorrow morning.

I might caution you to prepare probably for a longer day tomorrow as far as your schedule is concerned. You are in recess until 9:00 a.m.

*(Proceedings adjourned)*

REPORTER'S RECORD

VOLUME 3 of 9 VOLUMES

TRIAL COURT CAUSE NO. D-1-DC-12-301480

APPELLATE CAUSE NO. 03-13-00746-CR

| | | |
|---|---|---|
| STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| VS. | ) | TRAVIS COUNTY, TEXAS |
| | ) | |
| THOMAS ATKINSON | ) | 403RD JUDICIAL DISTRICT |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

STATEMENT OF FACTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

On the 19th day of September, 2013, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Brenda Kennedy, Judge presiding, held in Austin, Travis County, Texas:

Proceedings reported by Machine Shorthand.

APPEARANCES


JOE FREDERICK
District Attorney's Office
SBOT NO. 24057071
509 West 11th Street
Austin, Texas 78701
Phone:  (512) 854-9400
ATTORNEY FOR THE STATE

KEITH LAUERMAN
Attorney at Law
SBOT NO. 00786044
107 N. Lampasas St.
Round Rock, Texas 78664
Phone:  (512) 671-3200
ATTORNEY FOR THE DEFENDANT

VOLUME 3
PRETRIAL

SEPTEMBER 19, 2013                          Page   Vol.

Pretrial Motions.............................    4      3

Adjournment..................................   10      3

Court Reporter's Certificate.................   11      3

*(Open court, defendant present)*

THE COURT: This is Cause No. 12-301480, the State of Texas versus Thomas Trent Atkinson.

I'm looking in the file. Has there been an election filed?

MR. LAUERMAN: There has been one filed, Judge. I have it.

MR. FREDERICK: Judge, and I have another motion afterwards, if you wouldn't mind addressing that as well, additional witnesses.

THE COURT: Let me find the initial one first.

And, Darrell, you may have to print it if I can't find it.

THE CLERK: What is that?

THE COURT: That is a punishment election.

Do you have a copy of it?

MR. LAUERMAN: Judge, we have not made an election yet on that. That is going to be up to Mr. Atkinson today whether he chooses the jury or the Court to assess punishment in the event that there is a conviction.

THE COURT: Mr. Atkinson, have you made that decision --

THE DEFENDANT: No, ma'am, I'm making it today.

THE COURT: -- as far as election on punishment?

Pardon?

THE DEFENDANT: No, ma'am, I'm making it today.

THE COURT: Okay.

THE DEFENDANT: But I have decided a jury.

THE COURT: The jury?

THE DEFENDANT: Yes, ma'am.

THE COURT: Okay. So I will note that on the face of the election for jury punishment should we get to that phase of the trial.

All right. So that takes care of that.

Are there any other outstanding motions?

MR. FREDERICK: The first thing, Your Honor, is the State has filed an additional witness list listing Kelvy LaJuan Foster aka Sip, providing a copy in open court to defense counsel.

THE COURT: Is that this motion?

MR. FREDERICK: It was filed today, yes, ma'am.

THE COURT: All right.

MR. FREDERICK: And then I also filed a motion to photograph tattoos. It should be in the file. It was filed July 26, 2013.

THE COURT: The motion -- let me direct you back to the witness list motion. This is your initial witness list that also includes some additional people that you did not have?

MR. FREDERICK: Yes, ma'am, it is a supplemental.

THE COURT: Okay. And who are the additional people?

MR. FREDERICK: On this particular list, this one is a person by the name of Sip, he goes by, and is the last person under civilian, Kelvy LaJuan Foster.

THE COURT: Okay. And you've already given counsel notice of who that person is?

MR. FREDERICK: Yes, ma'am.

THE COURT: All right. Counsel, you have that?

MR. LAUERMAN: Yes, ma'am.

THE COURT: Okay. Your other motion is entitled what?

MR. FREDERICK: It's a motion to photograph tattoos.

THE COURT: I'm looking to see if it is in here. When did you file it?

MR. FREDERICK: July 26th.

THE CLERK: It hasn't made it into our file yet, Judge.

THE COURT: It has not?

THE CLERK: It hasn't. I don't have --

THE COURT: Here it is. Motion to Photograph Tattoos filed July 26th of '13.

MR. FREDERICK: Yes, ma'am.

THE COURT: Okay.

MR. FREDERICK: The defendant is a Crip with also gang tattoos on his chest and body. We wish to introduce those into evidence at punishment for the jury.

THE COURT: Do you have someone available to do the photographing?

MR. FREDERICK: Yes, ma'am, we have two investigators as well as the gang unit sergeant.

THE COURT: Counsel, you have received notice of this motion as well?

MR. LAUERMAN: Yes, Your Honor.

THE COURT: And discovery as to the relevancy of it?

MR. LAUERMAN: We have not discussed the

relevancy. I thought I would bring that up at the appropriate time.

THE COURT: At trial?

MR. LAUERMAN: Yes.

THE COURT: All right. So I will grant the motion to allow them to photograph those. As far as the use of those, we will take that up at trial.

MR. FREDERICK: Yes, ma'am.

The State also, Your Honor, would like to file a motion in limine on Monday before jury selection.

THE COURT: Okay. And, Defense, I'm assuming we will have one then or if it's not already here, if there is anything?

MR. LAUERMAN: We will file it on Monday as well.

THE COURT: Okay. So we will address that Monday before the trial starts.

THE DEFENDANT: What's that?

MR. LAUERMAN: We'll talk in a minute.

THE COURT: All right. Any other outstanding motions that we have not addressed?

MR. FREDERICK: None from the State.

MR. LAUERMAN: Judge, I had previously filed a series of motions, discovery motions, but I

think those have been covered by your standing order and I don't think there is any reason to go into those.

THE COURT: Okay.

MR. FREDERICK: Your Honor, there was a jail call between the defendant and his mother yesterday or the day before yesterday. I have left a copy of that for the defense attorney at the front desk.

THE COURT: In your office?

MR. FREDERICK: Yes, ma'am.

THE COURT: Okay. So this happened yesterday?

MR. FREDERICK: Yesterday or the day before.

THE COURT: All right. And, Counsel, you've been given that information to go by and pick that up?

MR. LAUERMAN: Yes.

THE COURT: All right. So your officers or whomever you have here to do the photographing, they're going to go in the back --

MR. FREDERICK: Yes, ma'am.

THE COURT: -- and take care of that?

MR. FREDERICK: Yes, ma'am.

THE COURT: Okay. All right. So we

will see you-all for trial 9:00 a.m. Monday morning.

MR. FREDERICK: Thank you, Your Honor.

THE DEFENDANT: Ma'am, can I get you to sign on this motion? I have already had it filed, but I need you to still sign on it.

THE COURT: Let me see what it is.

Yes, I will sign it.

THE DEFENDANT: Thank you.

THE COURT: It will go in the file.

THE DEFENDANT: I don't take that with me?

THE COURT: No.

THE DEFENDANT: I thought that -- you-all have a copy, but that's my copy.

THE COURT: You would get the copy. Any motion that I sign goes in the file. You can have a copy of it. Your attorney can get a copy of it for you.

THE BAILIFF: You want a copy of it?

THE DEFENDANT: Yeah.

THE COURT: So he can get a copy made and bring it back to you.

THE DEFENDANT: Okay.

*(Proceedings adjourned)*

REPORTER'S CERTIFICATE

STATE OF TEXAS )
COUNTY OF TRAVIS )

I, Roxanne Davenport, Official Court Reporter in and for the 403rd District Court, Travis County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of proceedings requested by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $_____ and was paid by Travis County.

WITNESS MY HAND this the 21st day of January, 2014.

/s/ Roxanne Davenport
Roxanne Davenport, TX CSR 5359
Expiration Date: 12/31/2015
403rd District Court
P.O. Box 1748
Austin, Texas 78767
(512) 854-9620
roxanne.davenport@co.travis.tx.us